UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

BRENDA CHANEY,                      )
                                    )
            Plaintiff,              )
                                    )        1:08-cv-00071-SEB-DML
      vs.                           )
                                    )
PLAINFIELD HEALTHCARE CENTER,       )
                                    )
            Defendant.              )

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on the Motion for Summary Judgment [Docket No.
26], filed by Defendant, Plainfield Healthcare Center, on February 19, 2009.  In its
motion, Defendant contends that Plaintiff's allegations of racial discrimination and
retaliation, brought under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981,
cannot succeed as a matter of law.  For the reasons set out below, Defendant's Motion for
Summary Judgment is <u>GRANTED</u>.


***Factual Background***

Plaintiff, Brenda Chaney ("Chaney"), is an individual residing in Indiana and a
former employee of Defendant, Plainfield Healthcare Center ("Plainfield").  Plainfield is
a 189 bed healthcare facility located at 3700 Clarks Creek Road in Plainfield, Indiana.
Plainfield provides various levels of care, including skilled care, traditional care, and
respite and hospice care, primarily to long-term residents. Aff. of Gray at ¶ 3-4.

In 2004, Chaney obtained certification to work as a Certified Nursing Assistant ("CNA").  In 2006, Chaney applied to work at Plainfield as a CNA and was interviewed by John Reyes ("Reyes"), Director of Nursing at Plainfield.  After the interview, on June 20, 2006, Plainfield hired Chaney to work as a CNA.  Dep. of Chaney pgs. 81, 169. Chaney was an "at-will" employee and did not have an employment contract with Plainfield at any time during her employment there.  Dep. of Chaney at 100.

Prior to beginning her actual work at Plainfield, Chaney attended an orientation session on June 22, 2006.  At this orientation, Chaney received documents related to her employment at Plainfield, including: (1) the Associate General Orientation Checklist; (2) the employee handbook; and (3) Plainfield's Abuse Protection and Response Policy. Dep. of Chaney at 85, 89, 97.  The employee handbook Chaney received detailed Plainfield's policies related to Equal Employment Opportunity; Discrimination in the Workplace; Discrimination, Harassment, and Retaliation Concern Procedure; and Standards of Conduct.  Dep. of Chaney at 91-92.  Chaney took this handbook home with her and read it over after the orientation.  Dep. of Chaney at 90.

Chaney's job duties as a CNA included the following: assisting residents to the bathroom and with bedpans; changing and cleaning residents; changing bed linens; stabilizing residents; and generally watching over residents.  Dep. of Chaney at 103-04. Chaney worked as a CNA at the Plainfield facility from late June 2006 until her termination on September 7, 2006.

### I. *Chaney's Complaints of Racial Hostility*

Chaney alleges that numerous instances of racial discrimination and harassment occurred during her employment at Plainfield.  Her specific allegations include the following:

• On at least two occasions, fellow employees at Plainfield directed derogatory comments at Chaney: on one such occasion, a fellow CNA named Audria ("CNA Audria") referred to Chaney, in her presence, as a "black bitch"; and, on another occasion, an unidentified nurse stated, in Chaney's presence, "why do they keep hiring these black niggers?"  Dep. of Chaney at 120, 121, 186, 210, 173-178.

• On at least three occasions, Chaney was prohibited from working with a certain resident because the CNA Assignment Sheet for that resident stated that the resident "prefer[red] no black CNAs."  Dep. of Chaney at 189, 193-94.

• On at least one occasion, Chaney was reminded by a co-worker that she could not assist a certain resident because of her race.  Dep. of Chaney at 124-125.

• Chaney states generally that she observed other black CNAs quit shortly after starting work at Plainfield because of racial hostility towards them.  Dep. of Chaney at 125, 129, 174.

Chaney asserts that she complained to her Unit Manager, Loretta Askew, as well as to another unidentified supervising RN, about the racial comments of which she was

the target.  Dep. of Chaney at 122, 125, 127, 128, 1130, 176, 197-98.[1]

## II.  Termination of Chaney's Employment

On September 6, 2006, Mandy Cafouras ("Cafouras"), a co-worker of Chaney's at

Plainfield, initiated a "Performance Improvement Notice," which complained that Chaney

had ignored a resident's bed alarm, even after Cafouras told her to check on it.  Chaney

did not apparently respond, at least not promptly.  Defendant's Submission to EEOC

[Exhibit 24] at 14.  After Cafouras herself went to check on the bed alarm, Chaney

entered the resident's room.  Cafouras asked Chaney to help with the resident, but Chaney

replied, "That's not my patient."  Id.  Chaney then apparently attempted to aid Cafouras,

at which point, according to Cafouras, Chaney stated, "She's shitting."  Id.  In addition to

describing this occurrence, Cafouras's Notice stated that Chaney had not done her "walk

through" that morning, as she was required to do.  Id.  Director of Nursing Reyes received

the Notice prepared by Cafouras on September 6.

Chaney disputes that she was reluctant to help and failed to do her duties.  She

contends that she never ignored the resident's light, but did not respond because it was

already past her official time to clock out for the day.  According to Chaney, she

reminded Cafouras that CNAs are prohibited from staying past their work shifts without

approval of a supervisor.  Chaney contends that Cafouras declined to approve extra work

---

[1]Chaney also contends that Askew expressly acknowledged that a climate of racism
existed at Plainfield.  However, Chaney's evidence as proffered is inadmissible hearsay.

time for Chaney, and, for this reason, Chaney left.  Dep. of Chaney at 134.

Chaney also argues that Cafouras's Notice referred to two CNAs and that it was CNA C.J. Hart, not Chaney, who refused to help Cafouras.[2]  Dep. of Chaney at 137, 141.  However, Chaney's assertion in this regard is not supported by the contents of Cafouras's Notice because Cafouras clearly refers only to Chaney as having been involved in the incident.  See Defendant's EEOC Submission at 14.

Chaney also contends that she never used the vulgar expletive, "shit," in any way in the resident's presence.  Dep. of Chaney at 150.   Unit Manager Loretta Askew, who is typically assigned the task of investigating incidents such as this one, investigated the complaint filed by Cafouras.  Aff. of Askew at ¶ 6c.  In the course of the investigation, the resident's roommate told Askew that she neither heard nor saw anything inappropriate during the incident in question.  Id. at ¶ 6d.  Askew reported this finding to Reyes, along with her belief that Cafouras fabricated the story.  Id. at ¶ 6e.  According to Askew, Reyes told her that she (Askew) was overstepping her duties and that he would, therefore, handle the matter.  Id.

After investigating Cafouras's allegations, Reyes concluded that Chaney had, in fact, engaged in the inappropriate conduct described.  Aff. of Reyes ¶ 21.  Reyes put his conclusions into a second "Performance Improvement Notice," dated September 6, 2006,

---

[2] Hart, who is white, was not questioned until fourteen days after the incident, several days after Reyes's decision to fire Chaney, and Hart received no documented discipline related to the event.  Defendant's EEOC Submission at 4.

and decided to terminate Chaney's employment.  Id. at ¶¶ 22-23.  Reyes contacted

Human Resources employee, Donna Gray, and asked Gray to inform Chaney that she was

fired.  Id. at ¶ 24.  The following day, Gray told Chaney that her employment had been

terminated and that she could come in the next day for a meeting with her supervisors,

who would explain to Chaney the basis for her termination.  Aff. of Gray at ¶ 7; Dep. of

Chaney at 143, 147.

On September 8, 2006, Chaney returned to Plainfield for a meeting with Reyes,

Gray, and Administrator Joe Pittman.  Dep. of Chaney at 147, 149, 212.  Chaney was

asked to give her version of the events, but the termination decision was not reversed.

Aff. of Reyes. ¶ 27.

On September 25, 2006, Chaney filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC charge").  Chaney's EEOC charge

alleged that she was subjected to racial harassment and discrimination and that Plainfield

was unresponsive to her complaints.  On October 18, 2007, the EEOC issued Chaney a

Notice of Rights letter.  Compl. ¶ 7.  On January 17, 2008, Chaney filed the Complaint in

the present action, bringing three counts against Plainfield: (1) race discrimination in

violation of Title VII of the Civil Rights Act of 1964; (2) race discrimination in violation

of 42 U.S.C. § 1981; and (3) retaliation in violation of Title VII.

<u>*Legal Analysis*</u>

## I.  *Standard of Review*

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  <u>See id.</u> at 255. However, neither the "mere existence of some alleged factual dispute between the parties," <u>id.</u>, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  <u>Michas v. Health Cost Controls of Ill., Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  <u>Id.</u> at 325.

7

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996).  To that

end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

## II. Hostile Work Environment

Chaney contends that Plainfield subjected her to a hostile work environment in violation of Title VII and § 1981, due to her supervisors' failure to take prompt remedial action to address: (1) her co-worker's alleged harassing comments; and (2) a CNA Assignment Sheet notation regarding the racial preferences of a Plainfield resident. Analysis of this alleged racially discriminatory behavior is essentially identical under both statutes.  Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 736 (7th Cir. 2006).

Title VII provides that "it shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986), the Supreme Court clarified that the "terms, conditions, or privileges of employment" language in Title VII encompasses *environmental* conditions of

9

employment, and that the scope of the prohibition "is not limited to 'economic' or 'tangible' discrimination." Id. at 64.  Therefore, a plaintiff may establish a violation of Title VII by proving that discrimination based on her being a member of a protected class has created for her a hostile or abusive work environment.  In order to rise to the level of a hostile work environment that is violative of Title VII, a plaintiff must show: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." Mendenhall v. Mueller Streamline Co., 419 F.3d 686, 691 (7th Cir. 2005).

In order to determine whether a working environment is hostile in this sense, courts may consider factors including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Hilt-Dyson v. City of Chicago, 282 F.3d 456, 463 (7th Cir. 2002), cert. denied, 537 U.S. 820 (2002) (quoting Faragher v.City of Boca Raton, 524 U.S. 775, 787-88 (1998)). Conduct that is unpleasant, but is not severe or pervasive, will not constitute a hostile work environment prohibited by Title VII.  See Saxton v. American Telephone and Telegraph Co., 10 F.3d 526, 533 (7th Cir. 1993).

Chaney first alleges that, on two occasions, her co-workers made racially charged comments, including the statement, "Why do they keep hiring these black niggers?," and a reference to Chaney as a "black bitch."  Dep. of Chaney at 173-178, 188.  The Seventh

10

Circuit recognizes that the use of the word "nigger" can be extremely disturbing to the listener and that, "while there is no 'magic number' of slurs that indicate a hostile work environment, [the use of] an unambiguously racial epithet falls on the 'more severe' end of the spectrum." Cerros v. Steel Technologies, Inc., 288 F.3d 1040, 1047 (7th Cir. 2002) (quoting Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 674-75 (7th Cir. 1993)).

In determining the severity of racial epithets, the Seventh Circuit considers whether they were directed at or uttered in the presence of the plaintiff. Thus, "when harassment is directed at someone other than the plaintiff, the impact of [such] 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." Smith v. Northeaster Illinois University, 388 F.3d 559, 567 (7th Cir. 2004). It is not clear from the record whether the slurs were directed in an aggressive manner toward Chaney, but she clearly contends that they were uttered in her presence and that the remarks referred to her. Thus, we regard the words as serious enough that a reasonable jury could conclude that they were both severe and objectively offensive. See Carros, 288 F.3d at 1047.

Chaney also alleges that she suffered racial harassment because of repeated reminders that she was prohibited from performing her duties with a certain resident because of that resident's racial bias, both in the form of a notation on the resident's CNA Assignment Sheet reading "Prefers No Black CNAs," and a personal reminder from a co-worker of the resident's preference. E.g., Dep. of Chaney at 124-25, 182, 189. The racial

character and negative tenor of these reminders is obvious, and Chaney has clearly claimed that she was personally offended.  We find that a reasonable jury could conclude that this conduct, too, was severe and offensive.

Although Chaney has demonstrated conduct which a reasonable jury could deem to be severe, she must also be able to demonstrate that there is a basis for employer liability.  Employer liability largely "turns on whether the alleged harasser was the plaintiff's supervisor, instead of a mere co-worker."  Rhodes v. Illinois Dep't of Transp., 359 F.3d 498, 505 (7th Cir. 2004).  Where, as here, the harasser is a co-employee, an employer can be held liable only if it has "been negligent either in discovering or remedying the harassment."  Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1032 (7th Cir. 1998) (quoting Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997)).  Once an employer is made aware of the problem, "the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring."  Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 978 (7th Cir. 2004) (quoting Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1048 (7th Cir. 2000)).

After the racially charged comments in the case at bar were reported to Unit Manager Askew, no further use of racial epithets occurred.  Dep. of Chaney at 177, 178.[3]

---

[3]Plainfield also contends that Chaney reported only the incident involving the use of the "n-word," but that it was another employee, not Chaney, who reported CNA Audria's reference to "black bitches."  Dep. of Chaney at 122, 127.

In Chaney's version of events, when she reported the problems, they would "go away for a minute," but then resume.  Id. at 181-182.  However, beyond her general assertion that the problems would resume, Chaney offers no evidence that vulgar race-based comments continued.  Her self-serving statements that her supervisors' efforts failed to resolve the problems are insufficient to create a genuine issue of material fact.  Albiero, 246 F.3d at 933.

Moreover, Chaney admits that the only specific discriminatory behavior that continued was one subsequent reminder by a co-worker that she could not work with a particular resident because of that resident's racial preferences.  Dep. of Chaney at 123, 139, 177, 178. Although such a reminder is certainly unwelcome, it is not like the racial slurs in terms of severity and thus is not actionable under Title VII.  See Saxton, 10 F.3d at 533.[4]  Because the evidence demonstrates that the truly discriminatory conduct, namely, references to Chaney as a "black nigger" and "black bitch," ceased as a result of the efforts of Chaney's supervisors, there is simply no basis, as a matter of law, for employer liability for these derogatory comments.  Thus, Chaney's claim in this regard ultimately must fail.

Clearly, Plainfield and its supervisors would have been on notice of the racial preference notation contained on a resident's CNA Assignment Sheet.  For employer

---

[4]Although Chaney asserts that other black employees left Plainfield because of racial hostility towards them, she does not cite any evidence to support this.  This assertion by itself is insufficient to create a genuine issue of material fact.  See Albiero, 246 F.3d at 933.

liability to arise, Plainfield's decision not to remove this notation must have been inappropriate under the circumstances.  <u>Wyninger</u>, 361 F.3d at 978.  According to Plainfield, removing the resident preference on the CNA Assignment Sheet, which is the only recourse that would have satisfied Chaney, would have put Plainfield in violation of Indiana law.

Chapter 410 Indiana Administrative Code 16.2-3.1-3, entitled "Resident's rights," sets out the rights held by residents in facilities like Plainfield.  A resident has the right to "choose a personal attending physician and other providers of services."  410 Ind. Admin. Code 16.2-3.1-3(n)(1).  A resident also has the right to "be cared for in a manner . . . that" fully recognizes "his or her individuality," <u>id.</u> at 16.2-3.1-3(t), as well as the right to "make choices about aspects of his or her life in the facility that are significant to the resident."  <u>Id.</u> at 16.2-3.1-3(u)(3).

These mandates define what can reasonably be expected of an employer like Plainfield.  Essentially, adopting Chaney's suggested response that such notations be redacted would require Plainfield to force a form of care upon the resident that threatens a violation of Indiana regulations.  Although in most situations "Title VII does not allow an employer to discriminate based on race in order to accommodate the actual or perceived invidious biases of its clientele," <u>Knight v. Nassau County Civil Serv. Comm'n</u>, 649 F.2d 157, 162 (2d Cir. 1981), Plainfield cannot reasonably be held liable for adopting a policy that permits a client to espouse racial bias, when that policy clearly represented a good-faith effort to conform to the mandates of Indiana law.  Accordingly, we must conclude

that Plainfield's decision to leave the otherwise unfortunate and unwelcome "Prefers no Black CNAs" notation on the resident's CNA Assignment Sheet was reasonable under the circumstances.  <u>See</u> <u>Motley v. Tractor Supply Co.</u>, 32 F.Supp.2d 1026, 1050 (S.D. Ind. 1998) (McKinney, J.) ("Just because the employee expected more from the employer, or a different response, does not mean that the employer failed to take appropriate remedial action.").

For the foregoing reasons, although Chaney has adduced sufficient evidence to show that she was subjected to racially harassing behavior, Plainfield cannot be held liable for that behavior because its responses were prompt, effective, and reasonable under the circumstances.  Therefore, Plainfield's Motion for Summary Judgment shall be granted as to Chaney's Hostile Environment claim.

### III.  Racially Motivated Termination

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  A Title VII "plaintiff can prove discrimination either by presenting evidence of discrimination (the 'direct method' of proof)," or by the burden-shifting analysis established in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973), (the "indirect method" of proof).  <u>Darchak v. City of Chicago Bd. of Educ.</u>, --- F.3d ----, 2009 WL 2778227 (7th Cir. 2009).  Although the parties confuse the

15

direct and indirect methods, they seem to have addressed both approaches in their

submissions, so we follow their lead and shall discuss both avenues of proof.

A. *Direct Method*

Typically, the direct method of proof is used when there is an admission of

discriminatory animus by the employer.  Phelan v. Cook County, 463 F.3d 773, 779 (7th

Cir. 2006).  It is undisputed that there has been no such admission by Plainfield here.

However, the Seventh Circuit recognizes that "[a] plaintiff can also prevail under the

direct method of proof by constructing a convincing mosaic of circumstantial evidence

that allows a jury to infer intentional discrimination by the decisionmaker."  Rhodes v. ,

359 F.3d at 504.  To defeat summary judgment using this method, "[a]ll that is required is

evidence from which a rational trier of fact could reasonably infer that the defendant had

fired the plaintiff because the latter was a member of a protected class."  Phelan, 463 F.3d

at 780 (quoting Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994)).

"That circumstantial evidence, however, 'must point directly to a discriminatory reason

for the employer's action.'"  Cerutti v. BASF Corp., 349 F.3d 1055, 1061 (7th Cir. 2003)

(quoting Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003)).

Chaney argues that the record contains evidence of suspicious timing, suspicious

circumstances, and a similarly situated employee not of her race who received better

treatment, all of which the Seventh Circuit has recognized as possible circumstantial

evidence of discrimination.  Hossack v. Floor Covering Associates of Joliet, Inc., 492

F.3d 853, 862 (7th Cir. 2007) (citations omitted).  First, she contends that there was suspicious timing, in that "her termination took place on the heels of Cafouras's allegation."  How exactly this casts suspicion of racial motivation on Plainfield is unclear, and Chaney provides no explanation.  Chaney does not contend that Cafouras's report was written because of racial bias, nor does she state why her being fired for the expletive incident relates to race.  In fact, this evidence supports the opposite conclusion: that Chaney was fired because of the incident reported by Cafouras, and not because of her race.

Second, Chaney contends that it is suspicious that Reyes ignored the conclusions Askew reached in her investigation of the incident reported by Cafouras.  Although Askew concluded that Cafouras fabricated the story about Chaney's saying "she's shitting" in the presence of a resident, Reyes told Askew that her investigatory conclusions "overstepped" her sphere of responsibility and that he would now handle it.  Aff. of Askew ¶6d.  Chaney further contends that it is suspicious that Askew was not involved in the final decision to terminate Chaney.  Presumably, the suspicious nature of all this arises from the fact that Askew is also an African American, and her absence in the process indicates that she was intentionally left out of a decision involving another African American.  However, Chaney presents no evidence that Askew would normally have been involved in a final termination decision such as this.  Therefore, any inference based on such suspicion is weak, at best.

Finally, Chaney contends that CNAs C.J. Hart and Audria were similarly situated

white CNAs who were treated more favorably than she was.  "To be similarly situated, another employee must be directly comparable in all material respects."  Hurst v. Ball Memorial Hosp., Inc., 2007 WL 1655794, at *5 (S.D. Ind. June 1, 2007).  Chaney must show that the comparable employee "reported to the same supervisor, engaged in the same conduct, and had the same qualifications," but must also show that "there were no differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them."  Ineichen v. Ameritech, 410 F.3d 956, 960 (7th Cir. 2005).

Chaney provides no evidence that Hart had the same supervisor or possessed the same qualifications as she did.  Moreover, although Chaney states that Hart was somehow involved in the incident that led to Chaney's termination, the record does not support this claim, and there is no evidence whatsoever that Hart was ever accused of using any inappropriate language such as the expletive referenced in this case in the presence of a resident.  These "differentiating or mitigating circumstance[s]" distinguish Plainfield's treatment of Hart as compared to Chaney.  Ineichen, 410 F.3d at 961.  As for Audria, Chaney does contend that Audria used vulgar expletives in front of residents, but provides no evidence in support of this fact beyond her own assertion.  This is insufficient to create a genuine issue of fact establishing that Audria was a similarly situated employee. Albiero, 246 F.3d at 933.

Beyond the deficiencies in Chaney's proffered circumstantial evidence, Chaney's attempt to show discrimination by the direct method fails more generally because she has not adduced evidence to refute Plainfield's stated nondiscriminatory reason for firing her.

18

Reyes investigated the incident alleged by Cafouras and decided to fire Chaney based on the clear, non-racial reasons that she used an expletive in the presence of and in reference to a resident and subsequently failed to perform her required job duties. This is a legitimate business decision that undermines any potential suspicions raised by Askew's lack of participation in the firing decision. Although Chaney attacks the validity of Reyes's investigation, whether that investigation could have been better conducted or whether it ultimately led to the wrong conclusion is irrelevant, as the Court "do[es] not sit as a superpersonnel department that will second guess an employer's business decision." Gordon v. United Airlines, Inc., 246 F.3d 878, 889 (7th Cir. 2001).

Reyes's decision to terminate Chaney clearly and reasonably relied on Cafouras's eyewitness account of the events in the resident's room. Chaney has simply adduced insufficient circumstantial evidence on the basis of which a reasonable jury could conclude that race entered into Reyes's decision to terminate her employment. Thus, Chaney's effort to show discrimination by the direct method of proof comes up lacking.

### B. Indirect Method

Under the McDonnell Douglas framework, a plaintiff must begin by establishing a *prima facie* case of discrimination. If one can be established, the burden shifts to the defendant to articulate a nondiscriminatory reason for the actions it took against the plaintiff. If the defendant can offer a legitimate, nondiscriminatory reason for the employment decision, the burden reverts to the plaintiff to show that there is a genuine

19

dispute of material fact that the proffered reason for the employment action is pretextual. Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005).  The traditional *prima facie* case requires a showing by the plaintiff: (1) that she was part of a class of persons protected by Title VII; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly-situated individuals outside her protected class were treated more favorably.  See Elkhatib v. Dunkin Donuts, Inc., 493 F.3d 827, 830 (7th Cir. 2007).  Because Plainfield does not challenge the first and third prongs of Chaney's *prima facie* case under the McDonnell Douglas framework, to wit, that she was a member of a protected class and that she was terminated, which constitutes an adverse employment action, only the following McDonnell Douglas analysis is at issue: the question of the adequacy of her work performance, the question of whether similarly situated employees were treated more favorably, and the question of pretext.

As stated previously, in part III.B supra, Chaney cannot show that any similarly situated employee was treated differently.  While "[a] similarly situated employee need not be 'identical,' . . . the plaintiff must show that the other employee dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]."  Caskey v. Colgate-Palmolive Co., 535 F.3d 585, 592 (7th Cir. 2008) (citations omitted).  Because neither CNA Hart nor CNA Audria was similarly situated to Chaney, she cannot satisfy the fourth prong of her *prima*

20

*facie* case.

Even if Chaney could satisfy this prong, she cannot show that she met Plainfield's legitimate employment expectations. Chaney cannot escape the fact that her use of the vulgar profanity, or at least Plainfield's belief that she used profanity, fell below Plainfield's clear and legitimate expectations. Chaney's use of profanity constituted verbal abuse against a client pursuant to Plainfield's Abuse Policy and also violated item 16 of the "Standards of Conduct" in the employee handbook, which Chaney stated that she had read. Dep. of Chaney at 144-145, 167-168. Thus, Chaney cannot satisfy the second prong of her *prima facie* case.

Even if Chaney could establish a *prima facie* case of discrimination, Plainfield offers a legitimate, nondiscriminatory reason for her termination. At the very least, Plainfield's termination decision was based on Reyes's belief that she used the word "shitting" in the presence of and in reference to a resident. Chaney adduces no evidence that Plainfield did not believe in the reasons given for her termination, and her contention that Plainfield's reasons for firing her were based on a flawed investigation is irrelevant. See Gordon, 246 F.3d at 889. Plainfield has pointed to a legitimate business reason for Chaney's termination, and Chaney has failed to produce any evidence that the reason given was pretextual. For all of these reasons, Chaney is unable to prove discrimination by the indirect method. Therefore, Plainfield's Motion for Summary Judgment shall be granted as to Chaney's claim of racially motivated termination.

## IV. Retaliation

Count III of Chaney's Complaint asserts a claim of Retaliation; under Title VII, it is unlawful "for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  Plainfield contends that Chaney is procedurally barred from bringing a retaliation claim because no such claim was preserved in her EEOC Charge.

In determining the permissible scope of the Complaint, the first place a Court must look is the Plaintiff's EEOC charge.  Babrocky v. Jewel Food Co., 773 f.2d 857, 863 (7th Cir. 1985).  In her EEOC charge, Chaney marked the box indicating "race" discrimination, but she did not mark the box for "retaliation."  With respect to her termination, Chaney stated only that Gray fired her and that "no valid reason was given for the discharge."  EEOC Charge [Defendant's Exhibit A], at 1.

"[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge."  Babrocky, 773 F.2d at 863.  Chaney does not respond in any way to Plainfield's contention that her retaliation claim fails on this procedural ground.  The "purpose of requiring the complaint to match the EEOC charge is to 'give[] the employer some warning of the conduct about which the employee is aggrieved and afford[] the EEOC and the employer an opportunity to attempt conciliation

22

without resort to the courts.'" <u>Tamayo v. Blagojevich</u>, 526 F.3d 1074, 1089 (7th Cir. 2008) (quoting <u>Ezell v. Potter</u>, 400 F.3d 1041, 1046 (7th Cir. 2005)).  Chaney had an opportunity to make a retaliation claim before the EEOC but failed to do so.  Because of this failure, she is now foreclosed from asserting this claim.  Plainfield's Motion for Summary Judgment shall therefore be granted as to Chaney's retaliation claim.

## V. Conclusion

Having carefully considered the parties' arguments regarding racial discrimination and retaliation, we conclude that Plainfield has not been shown to have violated Title VII or § 1981, as alleged by Chaney.  Accordingly, Plainfield's Motion for Summary Judgment is <u>GRANTED</u>.  Final judgment shall issue in accordance with this opinion.

IT IS SO ORDERED.

Date:  09/29/2009

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Justin Thane Bowen
THE NICE LAW FIRM
jtbowen@nice-law.com

Denise K. LaRue
HASKIN LAUTER  & LARUE
dlarue@hlllaw.com

Stephen D. LePage
HARRISON & MOBERLY
slepage@h-mlaw.com

Janet A. McSharar
HARRISON & MOBERLY
jmcsharar@h-mlaw.com